```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,          :
                                   :
                                   :
                                   :    05 Cr. 0078
                                   :
     -against-                     :    OPINION AND ORDER
                                   :
RICHARD PITRE,                     :
                                   :
               Defendant.          :
----------------------------------X
```

APPEARANCES:

MICHAEL J. GARCIA, ESQ.
United States Attorney for the
Southern District of New York
NICHOLAS J. GOLDIN, ESQ.
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2334

JESSE SIEGEL, ESQ.
(Attorney for Defendant)
251 East 61st Street
New York, NY 10021
(212) 207-9009

MICHAEL B. MUKASEY, U.S.D.J.

Richard Pitre, previously convicted of felony offenses in the courts of the State of New York, has moved to suppress a gun found in his possession on December 14, 2004, that forms the basis for the charge in this case, and statements he made following his arrest that day, arguing that the officers who found the gun lacked sufficient cause to detain and search him, and that he was not properly warned of his rights before he made incriminating statements.  He argues also that despite governing Circuit authority to the contrary, the statute under which he is charged, 18 U.S.C. § 922(g)(1), is unconstitutional, both facially and as applied, and alternatively was not intended to apply to him, essentially because the authority of Congress to regulate firearms possession is based on its power to regulate interstate and foreign commerce, and such possession, at least in his case, had nothing to do with such commerce.  An evidentiary hearing on the suppression motion was held on January 18 and 19, 2006.

For the reasons summarized below, both motions are denied.

I.

At about 8:30 p.m. on December 14, 2004, four police officers from the 42nd Precinct, clad in plain clothes, conducted

1

what was known as a "vertical" at 905 Eagle Avenue in the Bronx, after noticing several people congregated in the lobby of that building. (1/19/06 Tr. 71) A "vertical" involves traversing the building's hallways from top to bottom to determine whether dangerous or unlawful conditions exist. The building in question, owned by the New York City Housing Authority, was known to the officers of the 42nd Precinct as a "troublesome building" (Tr. 70) to which they had been summoned frequently to combat drug and firearms activity; those officers conducted "verticals" in their asserted capacity as legal custodians of the publicly owned building. (1/18/06 Tr. 6-8, 70-71)

Following the "vertical", which apparently disclosed no unlawful activity, the officers were standing in the lobby discussing where they would go next, when they noticed a woman enter the front door using a key. That door would lock automatically when it closed, but before it could close on this occasion defendant Richard Pitre caught it and entered the lobby immediately behind the woman. Two of the officers, Danny Santiago and Pedro Abreu, challenged Pitre, asking him whether he lived in the building and where he was going. According to both Abreu and Sergeant William Hall, Pitre immediately became nervous and stumbled for answers as he sought to justify his presence in the building. (1/18/06 Tr. 73, 94)

There was a discrepancy at the hearing between the

2

testimony of Santiago and Sergeant William Hall, on the one hand, and Abreu and the defendant on the other, as to whether the officers' shields were displayed at the time they initially confronted Pitre (compare 1/18/06 Tr. 8, 72, with 1/18/06 Tr. 92, 1/19/06 Tr. 9) I credit the testimony of both Abreu and the defendant that the shields were not initially displayed, because if undercover officers encounter unlawful activity during a "vertical" they can at least try to gain access to it as participants or spectators provided they are not displaying their badges, and if that does not work can always resort to displaying their badges. If badges are displayed from the outset, this flexibility is lost. However, as noted below, I see somewhat less significance in this than Pitre apparently does.

There was a discrepancy in the testimony also as to what the officers said, with Pitre claiming they asked him, "Yo, do you know anybody that's got dope or crack" and continued to challenge him with, "Yo, tell me who got the dope and crack." (1/19/06 Tr. 6) The officers testified that they asked him whether he lived in the building and where he was going. (1/18/06 Tr. 11, 72, 93) Here, I credit the testimony of the officers, whose version of this event is far more credible than Pitre's, in large part because for two reasons it is far more likely. First, the officers who saw Pitre enter an otherwise locked door by catching it before it closed had at least some

3

reason to believe that he did not live in the building, and the inquiry they testified to was an entirely natural response to what they had just seen. Second, it is highly unlikely that even someone who did not know they were police officers but did know about drug dealing would respond in any informative way to an inquiry from four total strangers in the lobby of a building as to where drugs could be found. The futility of such a stark inquiry must have been obvious to trained police officers and I find that it was not made here.

The officers moved closer to Pitre as they questioned him, and Pitre has suggested that he was in fact seized within the meaning of the law as soon as he came through the door, and with nothing but his entry through the door to justify the seizure. However, I credit the testimony of Santiago, who testified not once but twice to the effect that Pitre had started to walk past the officers when they hailed him (1/18/06 Tr. 10 ("He walked by quickly."), 40-41), and conclude that the officers moved closer as the questions were asked and Pitre seemed both nervous and evasive, touching his jacket repeatedly. This transpired in the time it takes a question or two to be asked and a subject to display unease, a period measured in seconds rather than minutes. (1/18/06 Tr. 42)

Santiago testified that when asked whether he lived in the building Pitre began to touch both his right front jacket

pocket and his pants, raised his hands, said he didn't "want any beef" (after which the officers "said, 'You don't have any beef with the police, do you?'"), and said he had come to visit a friend but could not identify with certainty where the friend lived. (Tr. 11) Abreu testified that the defendant was "fidgeting" as he walked into the building, identified first one apartment and then another as his destination, became "wide-eyed" and "sweating" and "reached for his right side", and said he "don't want no beef with you," after which Abreu, according to his testimony -- which I credit -- pulled out his shield and responded that Pitre "don't have to have any beef with police officers." (Tr. 94) Santiago said he noticed the right front jacket pocket the defendant touched was "a little heavy, and when he grabbed it and curled his fingers underneath the bottom of the jacket, I could see a bulge." (1/18/06 Tr. 13)

From the testimony of Santiago, Abreu and Hall I conclude that Pitre had not been touched up to that point, but when he continued to raise his hand toward his right jacket pocket, and a bulge in the pocket became apparent to Santiago, that officer instructed Pitre to place his hands against a nearby wall, and Abreu touched Pitre's right arm, apparently to guide him to the wall. (1/18/06 Tr. 12-13, 94)

Although I have resolved the dispute about the display of police shields in Pitre's favor, and concluded that the

shields were displayed only after questioning began and in response to Pitre's expressed desire to avoid a "beef," it is apparent, and I find, that Pitre was aware he was dealing with police officers as soon as he was asked whether he lived in the building. When four men of mixed ethnic background, one slightly older than the others, standing in the lobby of a building in the South Bronx, ask a young man who has just entered the building by stopping a door from locking whether he lives in the building and where he is going, that young man has every reason to believe that they are police officers, regardless of how they are dressed or whether they are displaying shields. Pitre, of course, was aware that he was in unlawful possession of a weapon, and his nervous demeanor and repeated touching of his pocket confirm that he had drawn the obvious conclusion that they were police officers before they so identified themselves. Indeed, his "I don't want no beef" confirms to my ear that he believed he was talking to people invested with authority rather than, as Pitre testified, to neighborhood ne'er-do-wells, toward whom I believe his vocabulary would have been more pointed.

Pitre's account of the confrontation makes little sense. Essentially, he said that he paid no attention to the officers when he first entered the building (1/19/06 Tr. 6) but when they blocked his way he thought they were merely "hanging out" (id. at 8, 9) and then suspected that they "were trying to

6

rob me or something like that" (id. at 10-11). His response, notwithstanding that he obviously knew he was in possession of a gun, was to get "into a little defense tactic, like a little boxing stance." (1/19/06 Tr. 7) If Pitre thought he was being set upon by four men intent on robbing him, it seems to me highly unlikely that he would assume a posture suggesting he was ready to take them on with his fists when he knew he had in his pocket something that would change the odds radically in his favor –- namely, the gun ultimately seized from him.

The officers testified, and Pitre conceded, that once he was placed near the wall with his hands on it, and the police shields were fully displayed, he tried to take his hands down. (1/18/06 Tr. 13, 74; 1/19/06 Tr. 10) According to both Santiago and Hall, Pitre again reached toward his right front pocket. (1/18/06 Tr. 14, 74) At that point, according to Santiago, Abreu "grabbed the pocket, went into the pocket and pulled out a firearm." (1/18/06 Tr. 14-15)

Although Pitre's memorandum of law suggests that there was no frisk, the only direct testimony on this point, delivered before any issue as to the nature of a frisk was raised, was Santiago's testimony, quoted above, to the effect that Abreu first "grabbed" the pocket and then put his hand in. Pitre was wearing a shearling jacket. (1/19/06 Tr. 11) As noted above, Santiago testified that he noticed the right hand pocket was "a

7

little heavy." (1/18/06 Tr. 13)  Abreu's grabbing of the pocket, where he obviously encountered a hard object that gave visible weight to the pocket even through shearling, and concededly weighed 24.3 ounces -- more than a pound and a half (1/19/06 Tr. 39) -- was, as explained more fully below, the frisk that justified reaching into the pocket to seize the gun.

After his arrest, Pitre was taken to what was referred to as the youth office at the 42nd Precinct, where Sergeant Hall read him the familiar Miranda warnings.  He then made admissions that Hall wrote down and read to Pitre, who then signed them. (1/18/06 Tr. 18, 76, 77-79)  Although Pitre claimed he had signed because he was tired, and disclaimed any recollection of having been advised of his rights or having read the hand-written record of his admissions before he signed it (1/19/06 Tr. 25, 35), I find that he was advised of his rights and reviewed his admissions by reading them and having them read to him before he signed the sheet on which they appeared.

II.

The government argues inter alia that the encounter in the lobby of 905 Eagle Avenue, ending in the discovery of the gun, was lawful as an investigative stop when measured by the standards of Terry v. Ohio, 392 U.S. 1, 22-23 (1968), where the Supreme Court held that police investigating suspicious behavior

may stop, briefly detain, and frisk a person for weapons in a public place without having to meet the Fourth Amendment's probable cause requirement. Pitre offers a two-pronged attack on the stop at issue here, claiming both that he had not done anything suspicious at the time he was stopped, and that Abreu did not properly frisk him for weapons, as the progeny of <u>Terry</u> require, but instead simply put his hand in Pitre's right front jacket pocket and pulled out the gun.

Pitre claims his keyless entry just behind the unidentified woman was not suspicious behavior because he could easily have been a resident of the building walking just behind another resident, and did not want to let the door close and then stand out in the cold -- this was mid-December -- fumbling for his keys. True enough, but there was more to the encounter before Pitre was stopped within the meaning of <u>Terry</u>. Recall that Santiago testified that Pitre had started to walk by and was asked whether he lived in the building and where he was going. Pitre could not give a clear account of himself. At that point, the officers were fully justified in stopping him as at least potentially a trespasser.

All that is necessary to justify a <u>Terry</u> stop is "reasonable, articulable suspicion that the [defendant] has been, is, or is about to be engaged in criminal activity." <u>United States</u> v. <u>Place</u>, 462 U.S. 696, 702 (1983). All that is necessary

9

is that the officer making a Terry stop "be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 7). Contrary to Pitre's suggestion, the police were fully justified in factoring into the equation the manner of his entry into the building. "[F]acts that seem wholly innocent in isolation may, when considered in combination, reasonably alert the suspicions of a trained [police officer]." United States v. Reyes, 821 F.2d 168, 170 (2d Cir. 1987). The facts here, including defendant's entry into the lobby by catching what otherwise would have been a locked door, and his nervous and confused response when asked whether he lived in the building and where he was going, fit comfortably within the Terry standard and fully justified the stop.

As noted above, Pitre objects as well to the manner of the frisk. Pitre argues that Abreu immediately put his hand inside the pocket that contained the gun, without first touching the outside of the pocket. The record does not support that argument. As noted, Santiago testified that Abreu "grabbed the pocket, went into the pocket and pulled out a firearm." (1/18/06 Tr. 14-15) Here, it is useful to recall that the purpose of a Terry frisk is to rule out the presence of a weapon, and that the pocket in question, which appeared to be heavy and which Pitre touched more than once, was in a shearling jacket. It would be

impossible to rule out the presence of a weapon in a shearling jacket unless the officer "grabbed" the pocket, as Abreu did; a mere "pat" of such a jacket would simply have disclosed what was already apparent -- that there was something heavy in the pocket, not its hardness or size.  Obviously, Abreu's "grab" did not rule out the presence of a weapon.  Indeed, it likely suggested strongly the presence of a weapon.  Cf. Minnesota v. Dickerson, 508 U.S. 366, 373-76 (1993) (contraband discovered through law enforcement officer's sense of touch during otherwise lawful Terry frisk may be seized just as properly as may contraband discovered through officer's sense of sight during otherwise lawful presence).  At the least, the "grab" generated uncertainty; if an officer is legitimately uncertain at that point whether an object felt during a frisk is a weapon, he is "entitled to remove it."  Untied States v. Oates, 650 F.2d 421, 429 (2d Cir. 1981).  When the weapon was retrieved there was probable cause to arrest Pitre.

Pitre's argument after the hearing as to adequacy of the Miranda warnings was perfunctory, and justly so.  The government easily carried its burden as to this issue.

### III.

As noted, Pitre has moved as well to dismiss the weapons charge against him, on the ground that the statute in

11

question, 18 U.S.C. § 922(g), is insufficiently connected to the power of Congress to regulate interstate commerce. Governing Circuit authority holds to the contrary, noting among other things that there is a required jurisdictional element that must be found as to each violation and that the Supreme Court has strongly suggested that that is enough. See United States v. Santiago, 238 F.3d 213, 216 (2d Cir. 2001)(per curiam), describing why prior Circuit authority upholding the statute need not be reconsidered following United States v. Morrison, 529 U.S. 598 (2000) and Jones v. United States, 529 U.S. 848 (2000). I assume this motion was made simply to create a record showing that the issue was not waived. The motion is denied.

For the above reasons, the motion to suppress and the motion to dismiss are denied.

SO ORDERED:

Dated: New York, New York
June 6, 2006

Michael B. Mukasey,
U.S. District Judge

12